IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


SHARON CHRISTINE GUY            )
                               )
v.                             )        No. 2:06-0065
                               )
MICHAEL J. ASTRUE,             )
        Commissioner of Social Security[1]    )


TO:     Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA"), denying the plaintiff's claims for a period of disability and Disability Insurance Benefits ("DIB") as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a limited range of light work during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 23) should be denied.

_____

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

# I. INTRODUCTION

The plaintiff filed a DIB application on December 11, 2001(tr. 88-103), alleging disability due to back and neck pain, bilateral carpal tunnel syndrome, and depression, with a disability onset date of October 31, 2001. (Tr. 89.) The plaintiff's claim was denied initially and upon reconsideration. (Tr. 57-60.) A hearing before Administrative Law Judge ("ALJ") William F. Taylor was held on January 22, 2004.[2] (Tr. 333-46.) ALJ Taylor delivered an unfavorable decision on April 19, 2004 (tr. 47-50), and the plaintiff petitioned for review of that decision before the Appeals Council. (Tr. 41.) On July 15, 2005, the Appeals Council remanded her claim for further proceedings. (Tr. 33-34.)

A hearing was held before ALJ Robert Erwin on October 31, 2005. (Tr. 347-72.) ALJ Erwin delivered an unfavorable decision on December 28, 2005 (tr. 17-25), and the plaintiff petitioned for a review of that decision before the Appeals Council. (Tr. 12.) On July 2, 2006, the Appeals Council denied the plaintiff's request for review (tr. 9), and the ALJ's decision became the final decision of the Commissioner.[3]

The plaintiff filed her complaint with this Court on August 14, 2006. Prior to the deadline for the Commissioner to file his answer, the plaintiff filed a motion to remand pursuant to sentence four of section 405(g). Docket Entry No. 9. By order entered November 8, 2007, the Report and

---

[2] The plaintiff apparently filed a prior application for DIB, which was denied, and she had a hearing in 1996 before ALJ Garner, who issued an unfavorable decision. *See* Tr. 335.

[3] The plaintiff filed a subsequent application for DIB on January 20, 2006, alleging disability since December 29, 2005. Docket Entry No. 28-1, at 1, 5. In a decision dated January 25, 2008, ALJ James A. Sparks declined to hold an additional hearing, finding instead that the record supported a favorable decision, and concluded that the plaintiff was disabled as of her alleged onset date. *Id.* at 1-5.

Recommendation (Docket Entry No. 20) was adopted and the plaintiff's motion to remand was denied. Docket Entry No. 21. The plaintiff then filed a motion for judgment on the record. Docket Entry No. 23. After the completion of briefing on that motion, the plaintiff filed a "Supplemental Motion to Remand," seeking to "renew" her request that her claim be remanded. Docket Entry No. 27. By Order entered October 17, 2008, the Report and Recommendation (Docket Entry No. 29) was adopted and the plaintiff's supplemental motion to remand was denied. Docket Entry No. 30.


## II. BACKGROUND

The plaintiff was born on March 2, 1965, and was 36 years old as of October 31, 2001, her alleged onset date. (Tr. 89, 105.) She completed high school (tr. 95) and her past jobs include employment as a seamstress and as a stocker and cashier for Walmart. (Tr. 90, 338.)


### A. Chronological Background: Procedural Developments and Medical Records

Prior to her alleged onset date, the plaintiff had a history of lower back and leg pain. (Tr. 179-86, 189-214.) On November 1, 2001, the plaintiff presented to Dr. Ken Colburn, a family practice physician, who diagnosed her with left arm pain and nerve compression syndrome. (Tr. 188.) On November 5, 2001, Dr. Steven Graham examined the plaintiff and opined that she had "chronic musculoskeletal/myofascial" lower back pain and pain in her "left upper arm and upper back." (Tr. 230.) Dr. Graham prescribed Doxepin[4] and Ultram[5] for the plaintiff. *Id.*

---

[4] Doxepin is an antidepressant. Saunders Pharmaceutical Word Book 241 (2009) ("Saunders").

[5] Ultram is an analgesic used to treat moderate to severe pain. *Id.* at 739.

3

On November 13, 2001, the plaintiff presented to Dr. Stephen Long with complaints of pain in her lower back, left shoulder, and lower left side. (Tr. 220.) The plaintiff also reported that she was sleeping poorly and depressed. *Id.* Dr. Long diagnosed the plaintiff with lumbar and cervical degenerative disc disease, lumbar radiculopathy, and "[r]epetitive motion injury of the left wrist." (Tr. 221.) He prescribed Lortab[6] and Mobic[7] for the plaintiff and scheduled her for a lumbar epidural steroid injection. *Id.* On November 20, 2001, Dr. Jeffrey York gave the plaintiff a lumbar epidural steroid injection. (Tr. 219.) On November 28, 2001, Dr. Craig Berteau administered a nerve conduction study on the plaintiff and opined that she had "[n]o electrophysiologic evidence" of neuropathy or of an acute radiculopathic process in her left upper extremity. (Tr. 224-25.) On December 5, 2001, Dr. York administered a second lumbar epidural steroid injection to the plaintiff. (Tr. 218.)

The plaintiff returned to Dr. Graham on December 10, 2001, and reported that her low back pain improved 25 percent after her two lumbar epidural injections. (Tr. 228.) The plaintiff related that her left arm pain is "more prominent" than her lower back pain. *Id.* Dr. Graham opined that the plaintiff's leg and arm strength was normal, and that she had "no significant" tenderness in her lower back, left upper arm, or left shoulder. *Id.* On December 12, 2001, Dr. Long examined the plaintiff and diagnosed her with lumbar degenerative disc disease and radiculopathy and cervical

---

[6] Lortab is a pain reliever prescribed to relieve moderate pain. *Id.* at 415.

[7] Mobic is a nonsteroidal anti-inflammatory drug prescribed to relieve arthritis. *Id.* at 457.

4

degenerative disc disease and radiculopathy. (Tr. 217.) Dr. Long prescribed Neurontin[8] and Trazodone[9] for the plaintiff and scheduled her for a cervical epidural steroid injection. *Id.*

On December 18, 2001, the plaintiff reported to Dr. Colburn that she had left arm pain and that she "[could not] stand it." (Tr. 187.) On December 21, 2001, and December 31, 2001, Dr. York administered cervical epidural steroidal injections to the plaintiff. (Tr. 215-16.) On January 29, 2002, the plaintiff reported to Dr. Graham that her arm pain had improved by 25 percent but that there was "no significant improvement in her lower back pain." (Tr. 227.) Dr. Graham opined that the plaintiff still had tenderness in her back and neck. *Id.* On the same day, Dr. Lawrence G. Schull, a non-examining consultative Tennessee Disability Determination Section ("DDS") physician, completed a physical Residual Functional Capacity Assessment ("RFC") on the plaintiff. (Tr. 231-39.) Dr. Schull found that the plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently, and could stand/walk or sit for about six hours in an eight hour workday. (Tr. 232-33.) He opined that the plaintiff's ability to push/pull was unlimited, and that she had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 233-36.)

On April 25, 2002, the plaintiff presented to Dr. Colburn with complaints of having a sore throat, cough, and fever. (Tr. 254.) On May 13, 2002, Dr. Mona Mishu, a non-examining, consultative DDS physician, completed a physical RFC on the plaintiff. (Tr. 242-47.) Dr. Mishu opined that the plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently, and

---

[8] Neurontin is used as an "anticonvulsant for partial-onset seizures" and to treat nerve pain. *Id.* at 488.

[9] Trazodone is an antidepressant and "serotonin uptake inhibitor" that is used to control aggressive behavior, alcoholism, panic disorder, agoraphobia, and cocaine withdrawal." Saunders at 716.

5

could stand/walk or sit for about six hours in an eight hour workday. (Tr. 245.) She determined that the plaintiff's ability to push/pull was unlimited, and that the plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 244-46.) Dr. Mishu also concluded that the plaintiff's ability to climb would be occasionally limited and that her ability to balance, stoop, kneel, crouch, and crawl would be frequently limited. (Tr. 244.)

On October 1, 2002, the plaintiff presented to Dr. Colburn with complaints of pain in her lower back and left arm and shoulder. (Tr. 253.) Dr. Colburn diagnosed her with myofascial pain syndrome and depression. *Id.* The plaintiff returned to Dr. Colburn on January 27, 2003, for her annual exam and he diagnosed her with chronic left arm and leg pain, chronic right side pain, and myofascial pain syndrome.[10] (Tr. 252.) On March 5, 2003, the plaintiff presented to rheumatologist Dr. Sivalingam Kanagasegar with complaints of neck and back pain. (Tr. 267-68.) Dr. Kanagasegar opined that the plaintiff's neck, shoulder, elbow, and wrist movements were normal; she had tenderness in her lower back; and "she [had] no obvious soft tissue tender points suggestive of fibromyalgia." (Tr. 268.) The plaintiff related that Lortab made her sleepy and that Darvocet[11] "works good and has in the past. *Id.* Dr. Kanagasegar took the plaintiff off Lortab and prescribed Paxil,[12] Neurontin, Darvocet, and Flexeril[13] for her. *Id.*

---

[10] Dr. Colburn examined the plaintiff again on February 11, 2003, and February 20, 2003, but his treatment notes from both exams are largely illegible. (Tr. 249-50.) The Court is only able to determine that on February 20, 2003, Dr. Colburn gave the plaintiff injections in the "trigger pt [point] area." (Tr. 249.)

[11] According to Drugs.com, Darvocet is "used to relieve mild to moderate pain with or without fever." Drugs.com, "Darvocet" at http://www.drugs.com/darvocet.html.

[12] Paxil is prescribed for the treatment of major depressive disorder and general anxiety disorder. PDR at 1636-37. Physicians Desk Reference 1586 (64th ed. 2010) ("PDR").

[13] Flexeril is muscle relaxant medication. Saunders at 294.

On April 9, 2003, the plaintiff had an MRI on her cervical spine that revealed a mild disc bulging and disc space narrowing in her back. (Tr. 275-76.) The plaintiff presented to neurologist Dr. Alan Bachrach on the same day with complaints of neck pain that radiated down her left arm. (Tr. 279.) Dr. Bachrach noted that the plaintiff had a supple neck, full motor strength, and was able to get up from a chair without using her hands. (Tr. 279-80.) He referred the plaintiff for Electromyography ("EMG") testing. (Tr. 280.) On April 18, 2003, the plaintiff's EMG revealed that although she had "significant degenerative disease in her neck," there was no evidence of entrapment, radiculopathy, or neuropathy. (Tr. 277-78.) On May 5, 2003, Dr. Kanagasegar examined the plaintiff and opined that her shoulder, wrist, elbow, and hip movements were normal; she had mild tenderness in her lower lumbar region; and both of her knees were normal. (Tr. 265.) Dr. Kanagasegar concluded that the plaintiff's hip pain was "most probably tronchantic bursitis" and that her lower back and neck pain was caused by degenerative joint disease and disc protrusion. *Id.* He increased the plaintiff's dosage of Neurontin and prescribed Flexeril and Darvocet for her. *Id.* Dr. Kanagasegar explained to the plaintiff that Neurontin may cause her to experience drowsiness, dizziness, and forgetfulness. *Id.* On September 24, 2003, the plaintiff presented to Dr. Colburn with complaints of neck and arm pain, and he continued to prescribe her medications. (Tr. 248.)

On November 25, 2003, Dr. Bachrach completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on the plaintiff and opined that her ability to lift/carry, stand/walk, sit, and push/pull was not affected by her impairments. (Tr. 270-71.) Although Dr. Bachrach determined that the plaintiff had no manipulative, visual, communicative, or environmental limitations, he concluded that her ability to climb, balance, kneel, crouch, crawl, and stoop would be frequently limited. (Tr. 271-73.)

On February 5, 2004, the plaintiff presented to Dr. Colburn for her annual exam. (Tr. 303.) Dr. Colburn noted that she had bowel and back problems, and he diagnosed her with obesity, fatigue, and depression. *Id.* The plaintiff returned to Dr. Colburn on April 13, 2004, complaining of a small "knot" located in her upper abdomen. (Tr. 301.) Dr. Colburn diagnosed her as having an abdominal hematoma. *Id.* On April 16, 2004, the plaintiff presented to Dr. Colburn with complaints of a sore throat, cough, and shortness of breath. (Tr. 300.) Dr. Colburn prescribed the plaintiff a Z-pack, Robitussin, and Albuterol and told her to drink more fluids. *Id.* On August 2, 2004, the plaintiff presented to Dr. Colburn with complaints of radiating lower back pain. (Tr. 299.) Dr. Colburn increased the plaintiff's dosage of Neurontin. *Id.* On October 21, 2004, Dr. Colburn diagnosed the plaintiff with back pain and noted that her back pain was exacerbated by pressure applied to the area. (Tr. 298.)

The plaintiff returned to Dr. Colburn on March 28, 2005, and he diagnosed her with chronic pain and knee pain. (Tr. 297.) Dr. Colburn recommended that the plaintiff continue taking Neurontin regularly. *Id.* On June 29, 2005, the plaintiff presented to Dr. Colburn with complaints of neck pain that radiated down to her elbows and caused occasional numbness in her fingers. (Tr. 296.) Dr. Colburn noted that the plaintiff's cervical spine and perispinal muscles were tender, and he diagnosed her with chronic pain,[14] neck pain, and bruising. *Id.* Dr. Colburn prescribed a refill of Darvocet for the plaintiff. *Id.*

On August 4, 2005, the plaintiff presented to Dr. Kanagasegar with complaints of generalized pain and on a scale of zero to ten the plaintiff rated her level of pain an eight. (Tr. 289.)

---

[14] In his treatment notes, Dr. Colburn indicated that he was uncertain whether the plaintiff's chronic pain could be attributed to fibromyalgia. (Tr. 296.)

8

Dr. Kanagasegar opined that "it looks like [the plaintiff] has chronic fibromyalgia syndrome, but she has slightly elevated C-reactive protein and she responded very well to Prednisone.[15]  We need to rule out inflammatory arthritis."  *Id.*  Dr. Kanagasegar continued the plaintiff's Prednisone prescription and discussed with her the importance of regular exercise and weight loss. *Id.*  The plaintiff returned to Dr. Kanagasegar on September 6, 2005, and reported that her prescriptions for Prednisone, Darvocet, Hydrocodone, Paxil, Neurontin, and Cyclobenzaprine[16] had not helped reduce her pain levels. (Tr. 288.)  The plaintiff reported that she still had neck and lower back pain, and that the pain made it difficult for her to comb her hair, drive, and walk. *Id.*  On a scale of zero to ten the plaintiff rated her level of pain an eight, and Dr. Kanagasegar found that there was "no evidence of inflammatory arthritis." *Id.*  Dr. Kanagasegar "[d]iscussed with [the plaintiff] about the importance of regular exercise and discussed in detail about fibromyalgia." *Id.*  He also prescribed Tramadol[17] and Tizanidine[18] for her. *Id.*

### B.  Hearing Testimony from January 22, 2004: The Plaintiff and Vocational Expert

The plaintiff's first hearing in this case was held on January 22, 2004, before ALJ William F. Taylor. (Tr. 333-46.)  The plaintiff was not represented by an attorney and she signed a waiver of right to an attorney or representative. (Tr. 335.)  The plaintiff and a Vocational Expert ("VE") testified at the hearing. (Tr. 334.)

---

[15] Prednisone is anti-inflammatory medication. Saunders at 575.

[16] Cyclobenzaprine is a muscle relaxant. *Id.* at 194.

[17] Tramadol is a pain reliever that is used to treat moderate to severe pain. *Id.* at 715.

[18] Tizanidine is a skeletal muscle relaxant that is used to provide relief from muscle spasticity. *Id.* at 709.

9

The plaintiff testified that she graduated from high school and had worked for Walmart and as a seamstress. (Tr. 338.) She related that she stopped working because she has fibromyalgia, neck pain, and a ruptured disc in her lower back. (Tr. 339.) The plaintiff stated that she is not able to lift her left arm above her shoulder and that she has difficulty driving. (Tr. 340.) The plaintiff testified that she injured her lower back in either 1993 or 1994, and that she "had difficulties" with her neck since the winter of 2000. *Id.*

The VE, Dr. Gordon Doss, testified that the plaintiff's past job as a sewing machine operator, as she performed it, is classified as medium and semi-skilled and unskilled. (Tr. 342.) He then classified the plaintiff's job as a stock clerk at Walmart as being medium and semi-skilled, and her job as a cashier at Walmart as being light and semi-skilled. (Tr. 342.) The ALJ asked the VE whether the plaintiff, who was a high school graduate and could operate an automobile, would be able to perform her past work given Dr. Bachrach's November 5, 2003, Medical Source Statement. (Tr. 343.) The VE answered that the plaintiff would be able to perform all of her past jobs. *Id.* The ALJ then asked the VE whether the same individual who was capable of lifting 50 pounds occasionally and 45 pounds frequently, was able to stand/walk or sit for about six hours in an eight hour workday, had unlimited pushing or pulling ability, and no visual, communicative, or environmental limitations would be able to perform the plaintiff's past work. The VE answered that the plaintiff would be able to perform her past jobs with those limitations. (Tr. 343-44.)

The ALJ next asked whether the plaintiff would be able to perform her past work if she were limited to carrying/lifting "no more than ten pounds," and the VE answered that she would be precluded from performing all of her past work. (Tr. 344.) However, the VE testified that the plaintiff would be able to perform work at the light and sedentary level. *Id.* He related that work as

10

a cashier,[19] receptionist, order clerk, information clerk, and entry level security guard would be available to an individual with the described lifting and carrying limitations. *Id.*

### C. Hearing testimony October 31, 2005: The Plaintiff and Vocational Expert

The plaintiff's second hearing was held on October 31, 2005, before ALJ Robert Erwin. (Tr. 347- 72.) The plaintiff was represented by an attorney, and the plaintiff and a VE testified at the hearing. (Tr. 348-49.)

The plaintiff testified that she graduated from high school and drives her automobile once a week. (Tr. 354.) She related that she last worked as a cashier and stocker at Walmart but that she had to stop working due to lower back and neck pain. (Tr. 354-55.) The plaintiff stated that she injured her back while giving birth to her son in 1991, and that she has received injections, therapy, and multiple medications as treatment. (Tr. 356.) She related that physical therapy was only a "temporary fix" for her back pain and that she uses a TENS Unit, heating pad, and pain medication to alleviate the pain. (Tr. 357.) The plaintiff testified that she received injections for her neck pain and also uses the TENS unit and a heating pad to alleviate that pain. *Id.* She stated that her neck pain radiates down both of her arms, although her pain and limitation of range of motion were more pronounced in her right arm. (Tr. 357-58.)

---

[19] This testimony is confusing, since the plaintiff testified that she had worked as a cashier Ttr. 335), the VE classified her past job as a cashier as light and semi-skilled (tr. 342), and the ALJ included her past job as a cashier in his hypothetical. (Tr. 343.) However, the VE testified that if she were limited to lifting no more than ten pounds, she would be precluded from her past jobs, but the VE also listed the job of cashier as sedentary. (Tr. 344.) It may be that the VE's explanation for this apparent discrepancy is contained in the "inaudible" portion of the transcript. (Tr. 344-45.) The Court assumes that there are cashier jobs that are sedentary and others, like her job at Walmart, that are light.

The plaintiff testified that she is able to sleep for only two hours at night due to neck, arm, and leg pain. *Id.* She related that her daughter helps her with grocery shopping, does most of the housework, and prepares meals. (Tr. 359-60.) The plaintiff stated that she attends church, has a healthy appetite, is able to walk less than a mile, and has difficulty brushing her teeth and washing and combing her hair. (Tr. 361.) She testified that she is able to sit for 15 minutes before she has to stand up and that she is able to stand for five minutes before she has to sit down. (Tr. 363.) The plaintiff related that she does not have any problems sitting if the chair is padded, has a built-in heating pad and massager, and allows her legs to be elevated. (Tr. 365.) The plaintiff testified that she is able to lift "[l]ess than a gallon of milk." (Tr. 363.)

The plaintiff testified that she has received treatment for depression and that she "breaks down" two or three times a week. (Tr. 363-64.) She related that she wears splints for her carpal tunnel syndrome, elbow braces, and back braces, and that she has had surgery on her left hand. (Tr. 364.) The plaintiff stated that she has difficulty writing and getting up from the toilet and out of the tub. (Tr. 365.) She testified that her medication puts her "in a fog" and makes her forgetful. *Id.* The plaintiff related that sitting relieves her back pain but that the pain still radiates down her arms. (Tr. 366.)

The VE, Jane Hall, described the plaintiff's previous jobs as a seamstress, as she performed it, as medium work and semi-skilled, and as a cashier and stocker at Walmart as both being medium work and unskilled. (Tr. 368.) The ALJ asked the VE to consider the work the plaintiff would be able to perform if she were limited to a range of medium work, could climb or bend occasionally, and could not reach overhead with either arm. (Tr. 368-69. The VE responded that the plaintiff could return to her past work as a seamstress or cashier. (Tr. 369.)

12

The ALJ then asked the VE what type of work the plaintiff could perform if he assigned her a light RFC; precluded her from work that required more than occasional climbing, stooping, bending, crouching, crawling, kneeling, or overhead reaching; limited her to standing, walking, or sitting for no more than an hour at a time; and barred her from gripping heavy objects with either hand. *Id.* The VE answered that the plaintiff could perform work as an inspector, tester, sorter, security guard, and parking lot attendant. (Tr. 370.) The ALJ next asked what type of work the plaintiff could perform, given the postural limitations in the preceding hypothetical, if she were limited to sedentary work, would have to sit and stand throughout the day for comfort, and could only occasionally use her hands for continuous fine or gross manipulation. *Id.* The VE responded that there would be no jobs available for the plaintiff to perform. (Tr. 371.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on December 28, 2005. (17-25.) Based on the record, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's disorders of the back and neck as well as carpal tunnel syndrome are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

13

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the following residual functional capacity: lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. She can stand or walk 1 hour at a time and can sit 1 hour at a time. She can push/pull at a level consistent with her ability to lift/carry. She is precluded from more than occasional climbing, stooping, bending, crouching, crawling, and kneeling. She is precluded from more than occasional reaching overhead with either arm. She can perform no heavy gripping with either hand.

7.      The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.      The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1653).

9.      The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as inspector/tester/sorter, with 3,600 jobs existing in the State of Tennessee and 143,000 in the Nation; security monitor/officer, with 1,300 jobs existing in the State of Tennessee and 80,500 in the Nation; and parking lot attendant, with 400 jobs existing in the State of Tennessee and 43,000 in the Nation.

14

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

(Tr. 24-25).


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support

15

the ALJ's determination.  42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)).  A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Secretary of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment."  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

16

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Secretary of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Secretary of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the

17

medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[20] *Id. See also Tyra v. Secretary of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Secretary of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 25.) At step one, the ALJ found that the plaintiff successfully demonstrated that she had not engaged in substantial gainful activity since October 31, 2001, the alleged onset date of disability. (Tr. 24.) At step two, the ALJ found that the plaintiff's back and neck disorders and carpal tunnel syndrome were severe impairments. *Id.* At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ concluded that the

---

[20] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

18

plaintiff could perform a "significant range of light work" but could not perform any of her past relevant work. *Id.* At step five, the ALJ found that the plaintiff could work as an inspector, tester, sorter, security guard, or parking lot attendant. (Tr. 24-25.)

The effect of this decision was to preclude the plaintiff from DIB and to find her not disabled, as defined in the Social Security Act, at any time after October 31, 2001, through the date of the ALJ's decision.

## C. The plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in developing the record, in evaluating the severity of her depression and fibromyalgia, and in analyzing her subjective complaints of pain. Docket Entry No. 24, at 8, 11-13. The plaintiff also requests that the Court remand her case to the Commissioner to consider newly submitted evidence. Docket Entry No. 24, at 13-14.

### 1. The ALJ fully and fairly developed the record.

The plaintiff contends that the ALJ did not "fully and fairly develop the record" regarding her claims of depression and fibromyalgia. Docket Entry No. 24, at 8, 11-13. Her argument for this issue focuses mainly on the ALJ's failure to properly evaluate her claims of depression and fibromyalgia, which the Court will address in the next two sections. *Id.*

The plaintiff argues that "'*Social Security proceedings are inquisitorial rather than adversarial*' and that the ALJ has the duty to '*investigate the facts and develop the arguments both for and against granting benefits*.'" Docket Entry No. 24, at 8 (emphasis in original) (quoting *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000). This language from *Sims*

19

referenced the Court's explanation in *Richardson v. Perales*, 402 U.S. 389, 411, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), that the ALJ was to remain nonpartisan and should not act as counsel for the SSA, but should "act[] as an examiner charged with developing the facts." Although the Court in *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048 (6th Cir. 1983), pointed out that there is no bright line test for determining when an ALJ failed to fully develop the record, it cited with approval decisions of other Circuits that interpreted the *Perales* doctrine and held that a special duty arises when the plaintiff is unrepresented and unfamiliar with hearing procedures. 708 F.2d at 1051-52.

It is well-established in the Sixth Circuit that the plaintiff, and not the ALJ, has the burden to produce evidence in support of her disability claim. *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008) (citing 20 C.F.R. § 404.15129(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 101 F.3d 104 (table), 1999 WL 357818, at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec. of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."). *Cf. Wright-Hines v. Comm'r of Soc. Sec.*, __ F.3d__, 2010 WL 616437, at *3 (6th Cir. Feb. 23, 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of her employment when her past work was part of the record and was the basis of the initial decision to deny benefits). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable

20

of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. Appx. at 459 (citing *Lashley*, 708 F.2d at 1051-52).

The special duty requirement is not at issue in this case since the plaintiff was represented by an attorney at the last hearing (tr. 347), and the plaintiff was familiar with the hearing process since she had gone through two prior hearings. (Tr. 333, 335, 347.) *See also* n.2 *supra.* Thus, absent the ALJ's special duty requirement to develop the record, the plaintiff maintains "the ultimate burden of proving disability." *Wilson*, 280 Fed. Appx. at 459 (citing *Trandafir v. Comm'r Soc. Sec.*, 58 Fed. Appx. 113, 115 (6th Cir. Jan. 31, 2003).

### 2. The ALJ properly evaluated the severity of the plaintiff's depression.

The plaintiff argues that the ALJ erred in assessing the severity of her depression at step two in the five step sequential process. Docket Entry No. 24, at 8-10. Specifically, the plaintiff contends that the ALJ did not comply with 20 C.F.R. § 404.1520a since he failed to properly document the "application of the [special] technique in [his] decision." Docket Entry No. 24, at 9.

According to 20 C.F.R. § 404.1520(c), which codifies step two of the five step sequential process, an impairment is considered severe if that impairment "limits your physical or mental ability to do basic work activities."[21] *See also* 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.") When assessing the severity of a plaintiff's mental impairment, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. §§ 404.1520a(a).

--------

[21] The regulations define basic work activities as being the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(a).

The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. § 404.1520a.  First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[22]  20 C.F.R. § 404.1520a(b)(1).  Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. §§ 404.1520a(b)(2).  The regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1).  Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[23] 20 C.F.R. § 404.1520a(c)(3).  These four functional limitations are known as the "B" criteria.   The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of mental disorders in  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The regulations require the ALJ to attach a point value to each of the four functional areas.  20 C.F.R. §§ 404.1520a(c)(4).  For the first three categories, the

---

[22] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. § 404.1520a(e).

[23] Decompensation is the "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's Illustrated Medical Dictionary 478 (30th ed. 2003) ("Dorland's").

regulations set forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.* The fourth category, episodes of decompensation, is rated with a four point scale: none, one or two, three, four or more. *Id.* "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the [plaintiff] is conclusively not disabled." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1520a(d)(1)).

The ALJ is also required to follow 20 C.F.R. § 404.1520a(e) in documenting the application of the special technique. The ALJ's written decision must include the germane findings and conclusions based on the special technique; show the plaintiff's significant history, such as medical examinations and laboratory findings, and the functional limitations considered in determining the severity of the plaintiff's mental impairments; and provide a specific finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in 20 C.F.R. § 404.1520a(c)(3).[24] 20 C.F.R. § 404.1520a(e)(2).

The ALJ concluded that the plaintiff's depression was not a severe impairment because it was controlled by medication. (Tr. 19.) The ALJ found that

> [w]hile the [plaintiff] has reported being unable to work due to the depression, it does not appear from the objective evidence of record that the depression has more than little effect on the [plaintiff] or her functioning. In only one of two pieces of objective evidence regarding depression, the progress note dated September 6, 2005, from Dr. Kanagasegar, he noted that she was taking the medication Paxil. The [plaintiff] also alleged depression upon examination at the Pain Management Clinic, but denied suicidal ideations and there were no neurovegetative signs of depression. While the [plaintiff] may have the medically determinable impairment of depression,

---

[24] Since 2000, the ALJ is no longer required to completed a Psychiatric Review Technique Form ("PRTF"). *Rabbers,* 582 F.3d at 653-54. The regulations only require that an ALJ's written decision "'incorporate the pertinent findings and conclusions based on the [special] technique." *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

> there is no objective evidence of record to indicate that the depression is not controlled with the psychotropic medication. As such, the condition of depression cannot be found to be a "severe" impairment as that term is defined in the Social Security Act and Regulations.

*Id.* The above passage indicates that the ALJ did not properly address the "B" criteria in 20 C.F.R. § 404.1520a(c). The Sixth Circuit has recognized that "'[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations.'" *Rabbers*, 582 F.3d at 654 (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004)). *See also Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") But the Sixth Circuit also applies the harmless error principle when reviewing administrative agency decisions in order to address situations in which remand would amount to nothing more than an "'idle and useless formality.'" *Rabbers*, 582 F.3d at 654 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), and citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001)).

In *Rabbers*, the Sixth Circuit made it very clear that a case should not be remanded for further administrative proceedings simply because an agency did not follow its procedures, unless "'the [plaintiff] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." 582 F.3d at 654 (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir.1983)). The *Rabbers* Court then sought to clarify the type of agency procedure violation that would constitute "prejudice[] based on the merits" or a deprivation of substantial rights and whether noncompliance with 20 C.F.R. § 404.1520a is harmless error. *Rabbers*, 582 F.3d at 655.

24

The *Rabbers* Court first discussed *Wilson*, noting that the Sixth Circuit has held that an ALJ's failure to provide "good reasons" for the weight he assigned to a treating physician's medical opinion is not harmless error and typically would require reversal and remand to the Commissioner. 582 F.3d at 655-56 (citing *Wilson*, 378 F.3d at 546.) In *Wilson,* the Court made an important distinction between regulations that grant procedural benefits to plaintiffs and regulations that are "'adopted for the orderly transaction of business before the [agency].'" 378 F.3d at 546 (quoting *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (alteration in original)). The Court in *Wilson* concluded that the reason-giving requirement of 20 C.F.R. § 404.1527(d)(2) was "an important procedural safeguard" put in place for the benefit of plaintiffs, and that it could not be discharged simply because evidence in the record supported the ALJ's rejection of the treating physician's opinion even though the end result would be the same after remand. *Wilson*, 378 F.3d at 547. Thus, an ALJ's failure to comply with the reason-giving requirement of 20 C.F.R. § 404.1527(d) was not harmless error. *Rabbers*, 582 F.3d at 656 (citing *Wilson*, 378 F.3d at 547).

In *Rabbers*, the Court found that *Wilson's* harmless error review had only been applied to the reason-giving requirement of 20 C.F.R. § 404.1527(d)(2) and declined to extend that application to 20 C.F.R. § 404.1520a. *Rabbers*, 582 F.3d at 656. The Court noted that the treating physician rule serves a very important role in the disposition of Social Security cases since a treating physician typically has a long standing relationship with the plaintiff and is able to provide detailed accounts of the plaintiff's medical impairments. *Id.* A treating physician brings a unique perspective to the disability determination process when compared to objective medical findings or single medical examinations. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). In *Wilson*, the Court concluded that the good reason requirement was a procedural safeguard implemented to make sure the ALJ applied the

25

treating physician rule. *Rabbers*, 582 F.3d at 656 (citing *Wilson*, 378 F.3d at 544). However, the *Rabbers* Court did not find that the "same rationale applie[d] in the context of an ALJ's failure to raise the B criteria." *Rabbers*, 582 F.3d at 656.

In *Rabbers*, the Court explained that requiring the ALJ to assign the B criteria a score is more of an "'adjudicatory tool'" put in place to aid the SSA in determining the severity of the plaintiff's mental impairment, whereas the good reason requirement was designed to provide an important procedural benefit to plaintiffs.[25] *Id.* (citing *Wilson*, 378 F.3d at 547). Furthermore, the *Rabbers* Court noted that the treating physician rule helps a plaintiff understand the outcome of her case since the potential exists that the plaintiff's treating physician previously found her to be disabled and that a SSA ruling to the contrary would leave the plaintiff confused. 582 F.3d at 657 (citing *Wilson*, 378 F.3d at 547). Lastly, the *Rabbers* Court pointed out that it would be easier for a reviewing court to apply the B criteria and determine if the plaintiff's mental impairment would have satisfied the criteria than it would be for a reviewing court to determine what an ALJ's reasoning would be for discrediting a treating physician's medical opinion.[26] *Id.* Ultimately, the Court in *Rabbers* held that "the special technique of 20 C.F.R. § 404.1520a" should not be regarded as such an "'important procedural safeguard'" to a plaintiff that "an ALJ's failure to rate the B criteria will rarely be harmless.'" *Id.* (citing *Wilson*, 378 F.3d at 547). Thus, it is clearly evident from *Rabbers* that the

---

[25] In *Rabbers*, the Court also pointed out that the language of 20 C.F.R. § 404.1520a "is worded in terms of the procedure's benefit to the SSA, not the [plaintiff]." 582 F.3d at 656.

[26] Specifically, the *Rabbers* Court noted that the "kind of evidence-evidence regarding the [plaintiff's] activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation [the B criteria]-is objective, concrete[,] factual[,] and medical evidence that will be apparent in the record, at least in some cases." *Id.* at 657.

26

Sixth Circuit is willing to apply the harmless error doctrine in cases addressing the special technique of 20 C.F.R. § 404.1520a.

The record medical evidence indicates that the plaintiff was diagnosed with and received medication for depression on several occasions. On November 13, 2001, the plaintiff first complained of being depressed to Dr. Long and reported that she was taking antidepressant medication, but he found that she had "no neurovegetative signs of depression." (Tr. 220-21.) A month later Dr. Long prescribed an antidepressant for her. (Tr 217.) On October 1, 1992, Dr. Colburn diagnosed the plaintiff with depression, and on March 5, 2003, Dr. Kanagasegar prescribed Paxil for the plaintiff. Dr. Colburn again diagnosed the plaintiff with depression on February 5, 2004 (tr. 303), and on September 6, 2005, the plaintiff reported that she was still taking Paxil. (Tr. 289.) Yet, none of those medical records described the severity of the plaintiff's depression or its effect on her.

It is also difficult to determine the severity of the plaintiff's depression from her testimony. The plaintiff did not allege that depression prevented her from working, testifying instead that neck and back pain kept her from working (tr. 355), but she did state that depression affected her ability to work. (Tr. 364.) The plaintiff related that she "does all right" on Paxil but that she has "crying spells" two or three times a week. (Tr. 363-64.) She also testified that she drives an automobile once a week (tr. 354), attends church, shops for groceries, and is able to walk less than a mile. (Tr. 359-61.)

Neither the plaintiff's testimony nor the record medical evidence indicates that the plaintiff's depression significantly affected her activities of daily living; social functioning; or concentration, persistence, or pace. The plaintiff's testimony that she has weekly "crying spells" is the only evidence in the record of possible decompensation. (tr. 364.) Further, as the ALJ pointed out, it is

27

reasonable to conclude from the objective record evidence that the plaintiff's depression was controlled by medication. Even if the ALJ had made specific findings regarding the B criteria and had properly applied the special technique of 20 C.F.R. § 404.1520a, it is clear from the record that the plaintiff's depression was not a severe impairment at step two of the five step process. Thus, the ALJ's failure to properly follow 20 C.F.R. § 404.1520a in determining the severity of the plaintiff's depression is harmless error.

### 3. The ALJ properly evaluated the severity of the plaintiff's fibromyalgia.

The plaintiff, without specificity, contends that the ALJ erred in evaluating the severity of her fibromyalgia. Docket Entry No. 24, at 10. At step two of the five step sequential evaluation process, the ALJ found that the plaintiff's "possible fibromyalgia" was a severe impairment. (Tr. 19.) Although the ALJ did not specifically discount the plaintiff's "possible fibromyalgia," it can be inferred that he concluded it was not a significant impairment. (Tr. 19-20.) The ALJ noted that rheumatologist Dr. Kanagasegar opined that the plaintiff had "no obvious soft tissue tender points suggestive of fibromyalgia" (tr. 20), and he assigned "[g]reat weight" to the medical findings of neurologist Dr. Bachrach, who concluded that the plaintiff's radiating neck pain was the result of "significant degenerative disease in her neck." (Tr. 21, 277-78.)

The Sixth Circuit has recognized that there is significant difficulty in diagnosing fibromyalgia.[27] *Huffaker v. Metro. Life Ins. Co.*, 271 Fed. Appx. 493, 2008 WL 822262, *6 n.2 (6th

---

[27] The Court of Appeals for the Sixth Circuit has cited the Seventh Circuit with approval in describing the difficulties in diagnosing fibromyalgia:

> [F]ibromyalgia, also known as fibrositis[,] is a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability

28

Cir. Mar. 25, 2008). Specifically, fibromyalgia is "difficult to confirm through objective testing since fibromyalgia patients generally present few or no objectively alarming signs. *Lyons v. Astrue*, 2009 WL 2515625, at *11 (M.D. Tenn. Sept. 10, 2008) (Wiseman, J.) (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988) (per curiam) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia), and *Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D.Ohio 2003) (observing that "[f]ibromyalgia is an 'elusive' and 'mysterious' disease" which causes "severe musculoskeletal pain")). However, the Sixth Circuit has also found that "'[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials.'" *Lyons*, 2009 WL 2515625 at *11 (quoting *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 244 (6th Cir.2007)).

Accordingly, the Court finds that the ALJ did not err in evaluating the plaintiff's fibromyalgia. The plaintiff was first examined for fibromyalgia on March 5, 2003, by Dr. Kanagasegar and he opined that the tender trigger points in her lower back were not indicative of fibromyalgia. (Tr. 268.) Two years later, Dr. Colburn queried whether the plaintiff's chronic pain was caused by fibromyalgia. (Tr. 296.) On August 4, 2005, Dr. Kanagasegar opined that "it looks

---

law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Huffaker*, 271 Fed. Appx. 493, 2008 WL 822262, at *6 n.2 (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) (internal quotation marks, alterations, and citations omitted)).

like [the plaintiff] has chronic fibromyalgia syndrome, but she has slightly elevated C-reactive protein and she responded very well to Prednisone. We need to rule out inflammatory arthritis." (Tr. 289.) A month later, Dr. Kanagasegar "[d]iscussed with [the plaintiff] about the importance of regular exercise and discussed in detail about fibromyalgia." (Tr. 288.) Although treatment notes from Dr. Colburn and Dr. Kanagasegar both questioned whether the plaintiff's chronic pain was caused by fibromyalgia, they never arrived at a concrete diagnosis. (Tr. 288-89, 296.) Further, in 2003, Dr. Kanagasegar conducted focal point testing on the plaintiff for fibromyalgia and the results were negative. (Tr. 268.)

Given the uncertain link between the plaintiff's chronic pain and fibromyalgia, the ALJ correctly assigned "[g]reat weight" to Dr. Bachrach's medical opinions since his findings are supported by substantial evidence in the record. (Tr. 21.) Dr. Bachrach's conclusion that the plaintiff suffered from "significant degenerative disease in her neck" (tr. 280) is supported by an April 9, 2003, MRI that revealed the plaintiff had mild disc bulging and disc space narrowing in her back. (Tr. 275-76.) Both Dr. Long and Dr. Kanagasegar also opined that the plaintiff's back and neck pain was the result of degenerative disc disease and disc protrusion. (Tr. 217, 220, 265.) Further, Dr. Bachrach's Medical Source Statement (tr. 270-71) closely aligns with the physical RFCs of Dr. Mishu and a DDS physician. (Tr. 231-39, 242-47.) Thus, the ALJ did not err in evaluating the plaintiff's fibromyalgia and he properly relied upon Dr. Bachrach's medical opinions.

30

### 4. The ALJ properly evaluated the credibility of the plaintiff's subjective complaints of pain.

The plaintiff argues that the ALJ erred in evaluating the credibility of her subjective complaints of pain caused by degenerative disc disease. Docket Entry No. 24, at 11. The ALJ found that there were:

> some inconsistencies within the record and as such cannot find the testimony of the [plaintiff] regarding complete and total disability credible to the degree alleged . The undersigned is not unsympathetic to the plight of the [plaintiff]; he recognizes that the [plaintiff] does have legitimate impairments that cause some degree of limitation. However, the objective record as a whole is more consistent with a residual functional capacity for a range of light work. The objective record does not show that the [plaintiff] has ever been prescribed strong narcotic medication, nor has surgery been recommended. Absent any aggressive treatment to the contrary, the undersigned cannot find that the impairments and limitations are present in such severity and duration as to preclude all work activity. Having considered the criteria of 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p, I deem the [plaintiff's] subjective complaints not fully credible.

(Tr. 22.) The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [her] subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his credibility determination such that both

31

the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[28] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)). The SSA also provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c).[29] The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence,

---

[28] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

[29] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

32

or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2).

There is objective medical evidence of the plaintiff's underlying degenerative disc disease. (Tr. 275-76.) An MRI from April 9, 2003, revealed that the plaintiff had mild disc bulging and disc narrowing in her back (tr. 275-76), and Dr. Long, Dr. Kanagasegar, and Dr. Bachrach all opined that the plaintiff had degenerative disc disease in her neck and back. (Tr. 217, 221, 265, 277-78.) This objective medical evidence satisfies the first prong of the *Duncan* test. However, there is minimal objective medical evidence confirming the pain that the plaintiff attributed to this condition. The Sixth Circuit has noted that "[w]ithout such evidence, this Court will generally defer to the ALJ's assessment." *Hash v. Comm'r of Soc. Sec.*, 309 Fed. Appx. 981, 990 (6th Cir. Feb. 10, 2009) (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990) ("deferring to the ALJ's credibility analysis where there was no objective medical support to confirm the disabling effects of claimant's underlying medical condition")).

First, the ALJ properly considered the side effects of the plaintiff's medications and complied with 20 C.F.R. § 404.1529(c)(3)(iv). *See* Docket Entry No. 26, at 2. On March 5, 2003, the plaintiff reported to Dr. Kanagasegar that Lortab made her sleepy and he decided to increase her dosage of Darvocet since "[it] works good and has in the past." (Tr. 267-68.) Two months later, Dr. Kanagasegar increased the plaintiff's dosage of Neurontin and "discussed with her the side effects[,] especially the drowsiness and dizziness and forgetfulness." (Tr. 265.) The plaintiff also testified that she is forgetful and not alert when she takes her prescribed medications. (Tr. 365.) However, besides the plaintiff's testimony, there is no evidence in the record indicating that side effects from her medications continued after her two 2003 visits with Dr. Kanagasegar. (Tr. 288-89, 296-303.) Further, it is clear from the ALJ's decision that he considered the effects of the plaintiff's

33

medication in determining her RFC since he noted that the "[plaintiff] takes pain medication and indicated that the medication affects her memory and concentration." (Tr. 20.)

Next, the ALJ acknowledged that the plaintiff "does have some legitimate impairments that cause some degree of limitation" and that he considered those limitations when he assigned her a RFC to perform a range of light work. (Tr. 22.) However, he also found that the plaintiff's subjective complaints of pain did not correlate with her medical treatment. *Id.* Although the ALJ incorrectly characterized the plaintiff's medications as not being "strong," he did properly determine that her treatment was not "aggressive." *Id.* The plaintiff's treatment plan consisted of epidural steroid injections that improved her neck and back pain (tr. 215-16, 219, 227-28), and pain relievers and anti-inflammatory medications. (Tr. 217, 221, 230, 268, 288-89.) The plaintiff also reported that she participated in physical therapy until 2003, and that it "lasts as good as long as you're doing it." (Tr. 356.) She continued with her physical therapy exercises at home but found that the exercises were only a "temporary fix." Over four years, the plaintiff's physicians did not deviate from their course of treatment and never discussed surgery or a return to physical therapy. (Tr. 216-21, 221, 228, 230, 252-53, 265, 268, 288-89, 296, 300-03.)

The alleged severity of the plaintiff's neck and back pain also does not align with the medical evaluations of Dr. Bachrach, Dr. Mishu, and a DDS physician. Dr. Bachrach's Medical Source Statement noted that the plaintiff's ability to lift/carry, stand/walk, sit, and push/pull was not affected by her impairments. (Tr. 270-71.) He found that she had no manipulative, visual, communicative, or environmental limitations, and that only her ability to climb, balance, kneel, crouch, crawl, and stoop would be frequently limited. (Tr. 271-73.) Both Dr. Mishu and a DDS physician completed physical RFCs on the plaintiff and opined that the plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently, and could stand/walk or sit for about six

34

hours in an eight hour workday. (Tr. 232-33, 245.)  They found that the plaintiff's ability to push/pull was unlimited, and that the plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 233-36, 244-46.)  Dr. Mishu did note that the plaintiff's ability to climb would be occasionally limited and that her ability to balance, stoop, kneel, crouch, and crawl would be frequently limited. (Tr. 244.)

The evaluations discussed above clearly show that the plaintiff was limited but not disabled by her impairments.  Lastly, the plaintiff's own testimony does not support the alleged severity of her neck and back pain.  She testified that she is able to drive an automobile once a week (tr. 354), attend church, shop for groceries, and walk less than a mile. (Tr. 359-61.)

There is substantial evidence in the record to support the ALJ's finding that the plaintiff's subjective complaints of pain limited, but did not preclude, her from working.  Although the ALJ understated the strength of the plaintiff's medication, the record indicates that her treatment plan remained largely unchanged over four years, RFC assessments by three physicians assigned minimal functional restrictions to her, and she engaged in various daily activities. Thus, the ALJ did not err in finding the degree of the plaintiff's subjective complaints of disabling pain were not credible.

The plaintiff also requests that the Court remand her case to the Commissioner to consider newly submitted evidence. Docket Entry No. 24, at 13-14.  In a Report and Recommendation entered on September 26, 2007 (Docket Entry No. 20), adopted by the Court on November 8, 2007 (Docket Entry No. 21), the Court has already determined that the evidence at issue was not new and material and that the plaintiff did not demonstrate good cause for its delayed submission. Docket Entry No. 20.  Since this issue has already been considered and decided by this Court, it will not be addressed again.

35

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 23) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge